UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-22554-CIV-HUCK/O'SULLIVAN

ELISEO LA BRUNO,

    Plaintiff,
v.

MIAMI-DADE COUNTY, a political subdivision
of the State of Florida, PUBLIC HEALTH TRUST
OF MIAMI-DADE COUNTY, an agency and
instrumentality of Miami-Dade County,
TIMOTHY P. RYAN, individually, DANIEL MERA,
individually, SONIA GRANNUM, ARNP, individually,
and ROBERT GONZALEZ, M.D., individually,

    Defendants.
_____/

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS (D.E. #36)

This matter is before the Court on Plaintiff Eliseo La Bruno's Third Amended Complaint (D.E. #34). La Bruno brings this action pursuant to 42 U.S.C. § 1983 against Defendants Director Timothy P. Ryan, Director of the Miami-Dade County Department of Corrections; Captain Daniel Mera, Captain of the Miami-Dade Pre-Trial Detention Center; Nurse Sonia Grannum, Director of Patient Care Services for the Public Health Trust; and Dr. Robert Gonzalez, Chief Medical Compliance Officer/Coordinator for the Department of Corrections, in their individual capacities, for deliberate indifference to La Bruno's medical needs when La Bruno was incarcerated at the Miami-Dade County Pre-Trial Detention Center and the Miami-Dade County Training and Treatment Center. Defendants filed a Motion to Dismiss Counts Three, Four, Five, and Six of the Third Amended Complaint (D.E. #36). They maintain that La Bruno has failed to plead sufficient facts to support a claim under § 1983 against any of the Defendants and has not pled sufficient facts to overcome the Defendants' qualified immunity. For the following reasons, Defendants' Motion to Dismiss is DENIED.

1

## I.   STATEMENT OF FACTS[1]

On December 9, 2007, City of Miami Beach Police Officers shot, and subsequently arrested, Plaintiff Eliso La Bruno after an alleged armed burglary. He was taken to the Jackson Memorial Ryder Trauma Center and admitted to the orthopedic spine service at Ward-D of Jackson Memorial Hospital for treatment of his gunshot wound. La Bruno had been diagnosed HIV positive in November 2007, and he advised the physicians and medical staff who treated him at Jackson of his status. He remained at Jackson as a prisoner patient until his discharge on December 13, 2007, at which time he entered the Miami-Dade County Pre-Trial Detention Center. Upon his arrival at the Pre-Trial Detention Center, La Bruno advised the prison officials who performed his medical and psychological screenings of his HIV positive status. La Bruno was incarcerated at the Pre-Trial Detention Center from December 13, 2007, until April 20, 2008, after which he was transferred to the Training and Treatment Center.

During his approximately four months at the Pre-Trial Detention Center, La Bruno, and others acting on his behalf, made numerous efforts to have his recently diagnosed HIV treated.[2] Although on January 24, 2008, approximately six weeks into his incarceration at the Pre-Trial Detention Center, his blood was tested to determine his CD4/t-cell and virus levels, which showed that his CD4/t-cell levels were 178 cells/mm$^3$[3], he did not receive any antiretroviral medication until the seventh month of his incarceration, shortly before he was transferred to the Florida Department of Corrections. On April 21, 2008, La Bruno was transferred to the Training and Treatment Center, where, in May 2008, he received another blood test to monitor his CD4/t-cell levels, which showed

---

[1] Some of the facts referred to in this Order come from documents attached as exhibits to the operative Complaint. Defendants' Motion to Dismiss helpfully points the Court to *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (determining that a court can consider documents central to the claim and obviously authentic in ruling on a motion to dismiss); *Jackson v. BellSouth Telecommunications, Inc.*, 181 F. Supp. 2d 1345, 1353–54 (S.D. Fla. 2001) (determining that a court can consider matters of public record appearing in the record of the case and documents referred to in the case and central to the plaintiff's claim).

[2] His efforts, as specifically directed towards each of the named defendants, are discussed in greater detail in individual fact sections. *See infra* subsections A, B, C, and D.

[3] Though not in the fact section, La Bruno asserts at numerous points in his Complaint that 350 cells/mm³ is the threshold at which the Department of Health and Human Services guidelines indicate that antiretroviral medication must be initiated and prescribed. Attached to the Complaint is a letter from La Bruno's primary care physician, Dr. Steven Santiago, attesting to this fact.

that the levels were now at 41 cells/mm³. Approximately six weeks into his time at the Training and Treatment Center, on June 5, 2008, La Bruno pled guilty to the aggravated battery charge pending against him.

On June 12, 2008, La Bruno was seen by Eleanor Allen, a Miami-Dade County social worker/case manager, who performed a "needs assessment" that allegedly addressed his need for antiretroviral medical due to his immunocompromised status. Although he does not specify when he was diagnosed, La Bruno alleges that at the time of his needs assessment, his HIV had evolved into AIDS. One month later, on July 8, 2008, La Bruno was seen by Dr. Jose G. Castro of the Special Immunology Clinic at Jackson Memorial Hospital, who prescribed La Bruno antiretroviral medication; on July 17, 2008, La Bruno began to receive antiretroviral medication from the Miami-Dade County Department of Corrections. A third CD4/t-cell blood specimen analysis, performed on July 21, 2008, showed that La Bruno's CD4/t-cell levels were 28 cells/mm³. La Bruno was transferred to the Florida Department of Corrections on July 21, 2008; it is unclear if the tests he received were administered there or at the Training and Treatment Center. He remained incarcerated at the Florida Department of Corrections until November 6, 2008.

La Bruno alleges that from the beginning of his time in custody of the Miami-Dade County Jail System, his medical records reflected that he had HIV.[4] La Bruno alleges that as a result of his failing to receive antiretroviral treatment for seven months, his HIV developed into full-blown AIDS, and he experienced chronic outbreaks and exacerbation of the human papillomavirus infection for which he had to undergo multiple surgical procedures. He further alleges that he experienced symptoms[5] as a result of his untreated HIV, including chronic night and cold sweats and chills, fevers, irregular bowel movements and diarrhea, skin infections and rashes, fungal infections, throat infections, ear aches, abdominal pain, acid reflux, weight loss, and significant psychological stress. La Bruno also alleges that he sustained irreversible damage to his immune system, and is now presdisposed to developing a life threatening infection or cancer, and has a significantly shortened

---

[4]These allegations are not in the fact section of the Third Amended Complaint; rather, they are in second count that delineates the § 1983 charges against the Public Health Trust.

[5]La Bruno alleges, though not in the fact section, that while some of his symptoms resulting from the untreated HIV were treated, the underlying HIV was not treated.

life expectancy.

### A.     Director Timothy P. Ryan

La Bruno alleges the following facts specifically against Director Ryan, Director of the Department of Corrections:

> 1. On January 9, 2008, Judge Lawrence Schwartz granted La Bruno's January 8, 2008 Motion for Department of Corrections to Provide Medical Treatment.[6] That day, a copy of the motion, the four letters[7], and Judge Schwartz's Order, "requesting/ordering" the Director of the Dade County Corrections and Rehabilitation Department (Director Ryan) to "provide appropriate medical treatment for [La Bruno] for his gunshot wound to the back and any other critical medication for such other critical needs," were all provided to Director Ryan by LaEatrice McMurray, Coordinator for the Public Defender's Early Representation Unit / Bond Hearing Unit.

---

[6] On January 8, 2008, La Bruno filed a Motion for Department of Corrections to Provide Medical Treatment in the Circuit Court of the Eleventh Judicial Circuit. The Motion did not specify that La Bruno was HIV positive; rather, it requested that the Department of Corrections provide medication for La Bruno's "immune deficiency." However, attached to the Motion were four letters that detailed La Bruno's HIV positive status. Defendants contend that the Motion did not put Director Ryan or Captain Mera on notice of La Bruno's HIV because it did not state the La Bruno was HIV positive; however La Bruno's Response points out that the letters detailing his HIV positive immunocompromised status and need for antiretroviral medication were attached to the Motion and Order that were provided to Director Ryan and Captain Mera. (D.E. # 39 at page 4).

[7] The first letter, from Dr. Daniel J. McCafferty to Judge Schwartz, outlined La Bruno's medical situation: he was HIV positive, immunocompromised, had dangerously low t-cell counts, and had been under the care of Dr. Steven Santiago, who was "in the process of beginning treatment, selection medications, monitoring side effects, and testing for viral sensitivities in an attempt to boost [La Bruno's] immune system and prevent the progression to AIDS."

The second letter, from Dr. Stephen Santiago, La Bruno's treating physician, to Judge Schwartz, informed the court that as of November 2007, La Bruno's t-cell count was $277/mm^3$ and his viral load was 318,000, which, according the Department of Health and Human Services Guidelines, meant that he needed to start antiretroviral medication as soon as possible in order to prevent his HIV from progressing to AIDS.

The third letter, also written by Dr. McCafferty on December 19, 2007, to Daniel Mera, Captain of the Pre-Trial Detention Center, expressed concern that La Bruno was not receiving the "adequate care" that Captain Mera allegedly assured Dr. McCafferty that La Bruno would receive; rather, although La Bruno had advised the jail medical personnel that he was HIV positive and immunocompromised, he was still not receiving adequate medical care, which mean treatment for his gunshot wound and HIV. (In the initial stages of La Bruno's time in the Miami-Dade County Department of Corrections, some of treatment requests included attempts to get care for the gunshot wound he received during his arrest; however, his § 1983 claims are premised on only his failure to receive antiretrovirals for his HIV).

The fourth letter, also from Dr. McCafferty, advised the Public Defender's Office that La Bruno was HIV positive.

    2.    On January 23, 2008, at a hearing before the Honorable John W. Thornton, Jr., La Bruno's attorney advised the court that La Bruno was still not receiving, among other needed treatment, antiretroviral medication for his HIV. Judge Thornton entered an "Order/Request" that "ordered/requested" the Director of the Dade County Corrections and Rehabilitation Department to send a member of the Department of Corrections medical staff "who had knowledge of La Bruno's medical treatment and care" to attend a hearing on January 25, 2008 in order to discuss La Bruno's medical needs and treatment. On January 25, 2008, a medical representative from Corrections Health Services appeared before Judge Thornton. Someone at the hearing advised the medical representative that La Bruno was HIV positive and needed antiretroviral medication.

    **B.**    **Captain Daniel Mera**

La Bruno alleges the following facts specifically against Captain Mera, Captain of the Pre-Trial Detention Center:

    1.    On December 13, 2007, Dr. McCafferty contacted Captain Mera and advised him of La Bruno's serious need for medical care as a result of his injuries and HIV positive immunocompromised status;

    2.    On December 17, 2007, Dr. McCafferty contacted Captain Mera but only reached his secretary; Dr. McCafferty advised Captain Mera's secretary that La Bruno was HIV positive, immunocompromised, and needed antiretroviral medication;

    3.    On December 19, 2007, Dr. McCafferty sent a letter expressing concern about LaBruno's HIV positive immunocompromised status and that fact that he was not receiving treatment for it;

    4.    On January 9, 2008, LaEatrice McMurray provided Captain Mera with a copy of LaBruno's January 9, 2008, Motion for Department of Corrections to Provide Medical Treatment, the Order for the Department of Corrections to Provide Medical Treatment, and the letters attached to the Motion and Order that detailed LaBruno's medical condition, critical CD4/t-cell count, and the need for immediate medical assistance in the form of antiretroviral medication to prevent the disease's progression to AIDS; and

In La Bruno's Response, following his specific allegations against Director Ryan and Captain Mera, La Bruno details other facts and events that he alleges Director Ryan and Captain Mera were "likely directly involved with or apprised of" but that cannot be alleged specifically against them

5

without the benefit of discovery. These facts and events are:

- LaEatrice McMurray's communications with Dr. Gonzalez, the Chief Medical Compliance Officer/Coordinator, and Nurse Grannum, the Director of Patient Care Services, on January 14, 2008, about La Bruno's serious medical needs, HIV positive immune compromised diagnosis, and immediate need for antiretroviral medication;

- Dr. Santiago's January 25, 2008 communications to the Department of Corrections/Corrections Health Services in which he (1) informed the Department of Corrections about La Bruno's HIV positive status and need for antiretroviral medication and (2) offered to fax the lab results showing La Bruno's CD4/t-cell and virus levels from November 2007 to the Department of Corrections and/or Corrections Health Services upon receipt of a medical authorization, which he never received;

- La Bruno's submission of multiple grievances and medical requests throughout his incarceration;

- The January 23, 2008 Order/Request that ordered/requested Director Ryan to send a member of the Department of Corrections medical staff who had knowledge of La Bruno's medical treatment and care attend a hearing scheduled for January 25, 2008 for the purpose of discussing the care and treatment needs for La Bruno's serious medical condition and the subsequent hearing held on January 25, 2008, where a medical representative of the Department of Corrections appeared per court order; (La Bruno alleges this fact specifically against Director Ryan but generally against Captain Mera);

- Judge Thornton's April 20, 2008 communication to the Department of Corrections enclosing correspondence from Dr. McCafferty outlining La Bruno's medical condition and immediate need for administration of antiretroviral medication;

- La Bruno's June 12, 2008 "needs assessment" performed by Eleanor Allen, a Miami-Dade County social worker/case manager; and

- La Bruno's continuous deterioration, including the decrease in his CD4/t-cell levels.

### C. Nurse Sonia Grannum

La Bruno alleges the following fact specifically against Nurse Grannum, Director of Patient Care Services for the Public Health Trust:

1. On January 14, 2008, LaEatrice McMurray contacted Nurse Grannum and

>left her a voicemail concerning La Bruno's serious medical needs, his HIV positive immunocompromised status, and immediate need for antiretroviral medication.

### D. Dr. Robert Gonzalez

La Bruno alleges the following facts specifically against Dr. Gonzalez, Chief Medical Compliance Officer/Coordinator for the Department of Corrections:

>1. Dr. Gonzalez's job duties included "rendering determinations of treatment and medications that inmates should receive;" and
>
>2. On January 14, 2008, La Eatrice McMurray contacted Dr. Gonzalez and advised him of La Bruno's serious medical needs, his HIV positive immunocompromised status, and immediate need for antiretroviral medication.

As with Director Ryan and Captain Mera, after alleging specific facts against Nurse Grannum and Dr. Gonzalez, La Bruno details other "facts and events" that he alleges Nurse Grannum and Dr. Gonzalez were "likely directly involved with or apprised of" but that cannot be specifically alleged against them without the benefit of discovery. Those facts include:

> - La Bruno's Motion for Department of Corrections to Provide Medical Treatment, filed on January 8, 2008;
>
> - Judge Schwartz's Order to Department of Corrections to Provide Medical Treatment, entered on January 9, 2008;
>
> - LaEatrice McMurray's communications [to Dr. Gonzalez, in Nurse Grannum's case, and visa versa] on January 14, 2008 ;
>
> - Dr. Santiago's communications with the Department of Corrections on January 25, 2008;
>
> - The multiple grievances and medical requests La Bruno filed throughout his incarceration, specifically while he was detained at the Pre-Trial Detention Center;
>
> - The January 23, 2008 Order/Request that ordered/requested Director Ryan to send a member of the Department of Corrections medical staff who had knowledge of La Bruno's medical treatment and care attend a hearing scheduled for January 25, 2008 for the purpose of discussing the care and

7

        treatment needs for La Bruno's serious medical condition;

- The hearing held on January 25, 2008 where a medical representative of the Department of Corrections appeared per court order;

- The letter that Dr. McCafferty send to Judge Thornton on April 20, 2008, detailing La Bruno's medical condition and need for antiretrovirals that Judge Thornton allegedly send to the Department of Corrections;

- La Bruno's June 12, 2008 needs assessment performed by Eleanor Allen, a social worker/case manager; and

- La Bruno's continuous deterioration, including his drastic reduction in his CD4/t-cell levels.

## II. LEGAL ANALYSIS

### A. Standard of Review

In reviewing a motion to dismiss, all well-pleaded facts in the plaintiff's complaint and all reasonable inferences drawn from those facts must be taken as true. *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994). A complaint must contain enough "facts to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), and the factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations omitted).

The Court has addressed the heightened pleading standard in detail in *Demaio v. Lamberti*, No. 10-60758-CIV, 2010 WL 3895610, at *3 (S.D. Fla. Oct. 1, 2010). There is no heightened pleading standard for § 1983 cases involving defendants who are able to assert qualified immunity as a defense. *Randall v. Scott*, 610 F.3d 701, 708 (11th Cir. 2010).

### B. 42 U.S.C. § 1983 Individual Capacity Claims Against Officials

Since La Bruno does not dispute that Defendants acted within their discretionary authority, and the Defendants allege that they did, La Bruno must show that the Defendants violated his constitutional right by making (1) an objective showing of a serious medical need and (2) a

subjective showing that the prison official acted with deliberate indifference to that need. He must also show that the constitutional right was clearly established at the time of the alleged violation. *Andjuar v. Rodrigez*, 486 F.3d 1199, 1203-04 (11th Cir. 2007) (citation omitted).

### 1. Qualified Immunity

"Qualified immunity offers a complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An official who claims entitlement to qualified immunity "must prove that the allegedly unconstitutional conduct occurred while [the official] was acting within the scope of his discretionary authority." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (citing *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir.1997)).

La Bruno does not dispute that Director Ryan, Captain Mera, Nurse Grannum, and Dr. Gonzalez were acting within their discretionary authority. His Complaint alleges that they acted, at all times material, "in the performance of their official duties."

### 2. Clearly Established Constitutional Right[8]

La Bruno had the right, as an HIV positive pre-trial detainee/prisoner, to be provided with antiretrovirals medication. For a constitutional right to be clearly established "its contours must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). By 2007 and 2008, the time frame during which La Bruno alleges a constitutional violation occurred, the Eleventh Circuit had clearly established that prison officials who refuse to provide necessary antiretroviral medication to HIV positive prisoners were acting with deliberate indifference to the prisoner's serious medical needs. *Brown v. Johnson*, 387 F.3d 1344 (11th Cir. 2004).

Defendants argue that the circumstances in *Brown* are factually distinct from La Bruno's, because in *Brown* the prison officials "stopped administering any antiretroviral medication to the

---

[8] A federal court can apply the two parts of the test in either order. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) ("[J]udges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.")

Plaintiff whatsoever, even after administering said treatment for a month." They assert that *Brown* defines "only the narrow right of HIV positive prisoners not to be completely denied treatment." Defendants argue that they are alleged to have merely delayed treatment, and therefore their conduct falls well short of the complete disregard and wantonness exhibited by prison officials in *Brown*. However, Defendants' assertion that La Bruno was not completely denied treatment is a distinction without a difference. The seven-month delay in providing La Bruno antiretroviral medication was tantamount to denial and, as alleged, resulted in La Bruno's HIV developing into AIDS. Tthus, *Brown* is similar enough to La Bruno's case that Defendants would have understood that failing to provide La Bruno with antiretroviral medication over an extended period of time, coupled with the knowledge that he urgently needed the medication, violated his constitutional right to be free from the unnecessary and wanton infliction of pain.

### 3. Violation of a Constitutional Right

Director Ryan, Captain Mera, Dr. Gonzalez, and Nurse Grannum knew that La Bruno was HIV positive needed antiretroviral medication, yet they did not provide him treatment for his HIV for, essentially, the entire period of his incarceration in the Miami-Dade County jail system. This failure violated La Bruno's constitutional right to be free from the unnecessary and wanton infliction of pain.

The Supreme Court has determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir.1999) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, a prisoner's claim of inadequate medical treatment does not automatically state a violation of the Eighth Amendment: "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id*. (citing *Estelle*, 429 U.S. at 105) (internal citations omitted). Additionally, a § 1983 claim "requires an affirmative causal connection between an official's acts and an alleged constitutional deprivation." *Pitts v. Poveda*, No. 07-21820-CIV, 2009

WL 347411, at *3 (S.D. Fla. Feb. 11, 2009).[9]

In the Eleventh Circuit, three tests exist to determine if a prison official acted with deliberate indifference to a prisoner's serious medical needs. Eleventh Circuit cases discussing deliberate indifference to medical needs begin with the same mandate: "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir.2003) (citing *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir.2000)). While all the cases begin with this basic requirement, there appears to be more than one test for deliberate indifference to medical needs in the Eleventh Circuit.[10]

One test, found in *Taylor v. Adams*, requires, as a part of the "objective inquiry," that a plaintiff first establish an "objectively serious deprivation," which requires the plaintiff show an "objectively serious medical need,"[11] and that "the response made by public officials to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligen[ce] in diagnosi[s] or treat[ment], or even [m]edical malpractice actionable under state law." *Taylor*, 221 F.3d 1254 (11th Cir. 2000) (internal citations and quotations omitted) (alterations in original). The plaintiff then must satisfy the subjective inquiry by showing the

---

[9] *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 999 (11th Cir. 1995). In *Swint*, the Eleventh Circuit determined that "although § 1983 does require proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation, [p]ersonal participation . . . is only one of several ways to establish the requisite causal connection . . . . [I]t is clear that the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation." *Swint*, 51 F.3d at 999 (internal citations and quotations omitted).

[10] *See Granda v. Schulman*, which points out that in the Eleventh Circuit, some courts use a "mere negligence" standard, while others use a "gross negligence" standard and that this these two standards create an "intra-circuit split as to the third prong of deliberate indifference regarding the actor's conduct." 372 Fed. Appx. 79, 82–83 (11th Cir. 2010) (unpublished). It appears that what the *Brown* and *Bozeman* constructs construe as factor three of the "subjective inquiry" requirement is what *Taylor* includes as factor two of the "objective inquiry": the conduct of the actor.

[11] Showing an "objectively serious medical need" is something a plaintiff can do by showing that his need is "one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment" because "the medical need . . . [is] one that, if left unattended, pos[es] a substantial risk of serious harm." *Farrow*, 320 F.3d 1235, 1243 (11th Cir. 2003) (alterations in original). In the instant case, that La Bruno had an "objectively serious medical need" is not disputed by Defendants. La Bruno's, as HIV positive inmate, meets the standard easily: the Eleventh Circuit has found that HIV is an objectively serious medical need. *See Brown*, 387 F.3d at 1352.

"subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish," which requires "demonstrat[ing] that the public official acted with an attitude of deliberate indifference . . . . which is in turn defined as requiring two separate things: aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [ ] and ... draw[ing of] the inference." *Taylor*, 221 F.3d at 1258.

A second test, used in *Brown v. Johnson*, requires that a plaintiff satisfy the objective inquiry by showing that he had an "objectively serious medical need" and that he satisfy the subjective inquiry by showing that an official responded to that serious medical need with deliberate indifference, which requires the plaintiff show that the official: (1) [had] subjective knowledge of a risk of serious harm; (2) disregard[ed] that risk; and (3) by conduct that [was] more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (internal citations omitted).

A third test, articulated in *Bozeman v. Orum*, requires that, as when using the *Brown* standard, a plaintiff satisfy the objective inquiry by showing that he has an "objectively serious medical need." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (citing *Brown*, 387 F.3d at 1351). Once plaintiff establishes that he has an "objectively serious medical need," he must satisfy the subjective inquiry by showing that the defendant had "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman*, 422 F.3d at 1272. (alteration in original).[12] Though *Bozeman* used the framework for the analysis articulated in *Brown*, it changed the level of negligence that had to be overcome from "mere" to "gross." This difference would, naturally, affect the degree of conduct that a plaintiff had to allege in order to establish a claim.

There is no suggestion that any one of the above standards is preferred by the Eleventh Circuit, but using one standard over another may lead to different results. Defendants use the *Bozeman v. Orum* "more than gross negligence" standard; La Bruno, although he includes the *Bozeman* standard in his Response as the one he is purportedly using, contends that Director Ryan,

---

[12] In *Bozeman*, the Eleventh Circuit substituted a "more than gross negligence" standard for *Brown's* "more than mere negligence" standard. *Bozeman*, 422 F.3d at 1272. *Bozeman* cited *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir.2004) (overruled on other grounds) and *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir.1996) for the proposition that "after *Farmer v. Brennan*, 511 U.S. 825 (1994), gross negligence fails to satisfy state-of-mind requirement for deliberate indifference." *Id*.

Captain Mera, Nurse Grannum, and Dr. Gonzalez were deliberately indifferent to La Bruno's serious medical needs because they acted "conduct that was more than negligent" rather than with "conduct that was more than [grossly] negligent." The standard which La Bruno seems to be using is the *Brown v. Johnson* standard of "more than mere negligence." However, regardless of which standard is applicable, La Bruno has met the standard. This is because, as alleged, Director Ryan, Captain Mera, Nurse Grannum, and Dr. Gonzalez acted with "more than gross negligence" as articulated in *Bozeman*.

Case law from a number of circuits provides guidance regarding the liability of the supervisor, oftentimes a prison director or administrator, when a prisoner brings a § 1983 deliberate indifference claim. In *Brown*, for instance, the Eleventh Circuit determined that a district court had improperly dismissed a plaintiff's complaint, which alleged deliberate indifference to medical needs against both the medical administrator of the prison and the prison doctor, where the plaintiff had shown that they were aware of the [plaintiff's] diagnosis with HIV and hepatitis yet completely withdrew prescribed treatment, and where the plaintiff "was not receiving any treatment apart from clinic visits, despite his deteriorating condition." *Brown*, 387 F.3d at 1351. Specifically, in *Brown*, the plaintiff filed a grievance with the prison's medical administrator against the prison doctor who stopped prescribing him treatment, but the administrator denied it on the grounds that "the physician [had seen him] recently, [he would] be seen in the next chronic clinic, [and the warden did] not feel that further action [was] warranted." *Id*. at 1350.

Aside from that fact-specific determination, *Brown* also reiterated the broader teaching that "[a] prisoner states a valid claim, under [§ 1983], whether the indifference is manifested by prison doctors in their response to the prisoner's needs . . . or by prison guards in intentionally denying or delaying access to medical care . . . or intentionally interfering with treatment once proscribed." *Id*. at 1351 (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). *Brown* also delineated actions that can constitute deliberate indifference: "grossly inadequate care, as well as by a decision to take an easier but less efficacious course of treatment . . . . [and][w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all." *Id*. (citing *McElligott v. Foley*,

13

182 F.3d 1248, 1255 (11th Cir. 1999).[13]

Similarly, in *Montogomery* v. *Pinchak*, the Third Circuit found that a prisoner had stated a claim for deliberate indifference where prison officials knew that the prisoner had HIV and needed antiretroviral medication, because the jail's own medical staff had determined the medication was necessary, but denied him medication and treatment for ten months. 294 F.3d 492, 500–01 (3d Cir. 2002).

Other actions more subtle than the denial of prescribed medicine can sustain a claim of deliberate indifference. In *Verser v. Elyea*, a district court found that a prison's Chief Administrative Officer and Head of State Prison's mere concurrence with the denial of a prisoner's grievance appeal was enough to establish the personal involvement required to sustain a deliberate indifference claim because there was a sufficient "causal connection or affirmative link between the action complained about and the official sued." 113 F. Supp. 2d 1211 (N.D. Ill. 2000) (internal citation omitted). Conversely, action by a prison official that shows some level of action on behalf of a prisoner's request for medical attention can support a dismissal of the deliberate indifference claim. In *Marquez v. Quarterman*, for example, a district court dismissed a deliberate indifference claim against a dental hygienist when there was evidence on the record at the motion to dismiss stage she took steps to see that a prisoner got required dentures by "referring him to dentist for screening," a fact that the court found indicated that she was "receptive to his request and forwarded his name for consideration, as opposed to being deliberately indifferent by automatically denying his request for dentures." 652 F. Supp.2d 785, 789–90 (E.D. Tex. 2009).

La Bruno alleges that Director Timothy P. Ryan, Captain Daniel Mera, Nurse Grannum, and Dr. Robert Gonzalez were deliberately indifferent to his serious medical needs by failing to respond

---

[13]*See also Skillern v. Georgia Dept. of Corrections*, 191 Fed. Appx. 847, 854 (11th Cir. 2006) (holding that prisoner stated deliberate indifference claim against a state corrections department and several employees of the corrections department by alleging that "during his incarceration, his doctors had diagnosed him as suffering from a heart condition, and the defendants were deliberately indifferent to this condition by not giving [him] requested drug therapy that [his] doctors had prescribed for this condition"); *Hatten v. O'Drain*, No. 2:05-cv-6-FtM-99DNF, 2008 WL 594769, at *5 (M.D. Fla. 2008) (unpublished) (determining that a jury could reasonably conclude that prisoner stated claim for deliberate indifference against supervisor who was aware prisoner had HIV and was not being provided with HIV medication, even when supervisor contended that "other people were responsible for treating inmates"); *Taylor v. Barnett*, 105 F. Supp.2d 483, 487–88 (E.D. Va. 2000) (determining that prison official's "withholding life-sustaining AIDS medication is clearly sufficiently objectively serious" although noting that prisoner must still show that prison official acted with subjective deliberate indifference).

appropriately to La Bruno's HIV positive immunocompromised status, denying La Bruno necessary and essential medical care, and by failing to address and rectify the denial of medical care and the delayed access to treatment and medication during La Bruno's incarceration in the Pre-Trial Detention Center and Training and Treatment Facility. La Bruno alleges that the result of their deliberate indifference was (among other debilitating physical maladies and symptoms) that his HIV progressed to AIDS.

La Bruno contends that Defendants are liable "based on [their] direct participation with respect to [La Bruno] by virtue of their own actions and/or omissions." La Bruno's allegations center on their failure to act on their knowledge that (1) La Bruno had HIV; (2) needed antiretrovirals to prevent his HIV from progressing to AIDS; and (3) was not being provided with those antiretrovirals by the Department of Corrections.[14] Though the quantity of factual allegations alleged against each of the Defendants varies, the substance of the allegations against each reveals the same reality: the Defendants each knew that La Bruno had HIV and needed treatment; they each knew he was not receiving treatment; they each were in a position to ensure that he received treatment; and they each failed to do so.

Even applying the "more than gross negligence" standard from *Bozeman*, the facts alleged by La Bruno establish claims for deliberate indifference against each of the Defendants. La Bruno easily meets the objective showing inquiry, the first step in showing a constitutional violation, by alleging that he has HIV, since HIV is a disease that the Eleventh Circuit has ruled is a serious medical condition. *Brown*, 387 F.3d at 1351. The *Bozeman* standard requires that after a plaintiff shows that he has an "objectively serious medical need," he satisfy the subjective inquiry by showing that the defendant had "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman*, 422 F.3d at 1272. (emphasis added) (alteration in original). A subjective inquiry analysis of the facts alleged against each Defendant

---

[14] La Bruno alleges that Defendants "deliberately disregarded, ignored, and failed to react to a to a widespread health or safety problem in connection with La Bruno," "failed to respond appropriately to a court orders served directly upon him requiring treatment of La Bruno's serious medical condition," "failed to investigate as to the status of La Bruno's serious medical condition and his care and treatment after learning of the denial of adequate medical care" and "failed to discipline or prosecute known instances where medical treatment was being denied to inmates diagnosed with the HIV virus or AIDS," and "failed to ensure that La Bruno received his antiretroviral medication after learning of the denial of adequate medical care.

establishes that they responded (or failed to respond) to the risk posed to La Bruno with conduct that was more than gross negligence.

        a.    *Count III: Director Timothy Ryan Analysis*

Using a reasonable inference from the facts La Bruno alleges against Director Ryan, even under the "more than gross negligence" standard articulated in *Bozeman* test, La Bruno has alleged sufficient facts to establish that Director Ryan was deliberately indifferent to La Bruno's serious medical need.

Director Ryan had subjective knowledge of a risk of serious harm to La Bruno: LaEatrice McMurray provided Director Ryan with Judge Schwartz's January 9, 2008 Order to Provide Medical Treatment, the Motion to Provide Medical Treatment, and the letters from Dr. McCafferty and Dr. Santiago that detailed La Bruno's HIV positive immunocomporimised status and need for antiretroviral medication. Director Ryan disregarded the risk posed to La Bruno and did not comply with the order, which resulted in Judge Thornton issuing an order, on January 23, 2008, requiring that Director Ryan send a Department of Corrections medical representative to a hearing. Although Director Ryan complied with the second order and sent a medical representative, he never complied with the first order to provide necessary medical treatment to La Bruno.

Instead, that order remained outstanding for six months, while La Bruno's HIV progressed to AIDS and his condition deteriorated. Disregarding a court order, as here, may constitute conduct that is more than grossly negligent. Although on January 24, 2008, two weeks after the order to provide treatment, La Bruno had blood drawn so that lab studies could be done to determine his CD4/t-cell levels (which had deteriorated), La Bruno was afforded no meaningful treatment—*i.e.*, the provision of antiretroviral medication—until more than six months later, on July 17, 2008.

Given the alleged facts and the reasonable inferences drawn from them, La Bruno has stated a claim for deliberate indifference against Director Ryan. Thus, Director Ryan is not entitled to qualified immunity.

        b.    *Count IV: Captain Daniel Mera Analysis*

Using a reasonable inference from the facts La Bruno alleges against Captain Mera, even under the "more than gross negligence" standard articulated in *Bozeman* test, La Bruno has alleged sufficient facts to establish that Captain Mera was deliberately indifferent to La Bruno's serious

medical need. Captain Mera had subjective knowledge of a risk of serious harm to La Bruno: in the first week that La Bruno was incarcerated, Dr. McCafferty advised Captain Mera personally, through his secretary, and in writing that La Bruno was HIV positive and needed antiretrovirals. Additionally, LaEatrice McMurray provided Captain Mera with a copy of the January 9, 2008 Order to Provide Medical Treatment, as well as the Motion and attached letters that detailed La Bruno's HIV positive condition and need for antiretroviral medication. Captain Mera disregarded the risk posed to La Bruno; he received three communications regarding La Bruno's need for antiretrovirals and a copy of the Order to Provide Treatment, yet he still failed to ensure that La Bruno got the medical care he needed. Captain Mera failed to provide necessary antiretrovirals to a prisoner whom he knew had HIV and needed treatment. Moreover, Captain Mera had a copy of the Order to Provide Medical Treatment; as with Director Ryan, it remained as a tangible reminder that there was court-ordered obligation to ensure that La Bruno received treatment for his HIV. As Director Ryan, Captain Mera's disregard of a court order to provide medical treatment to La Bruno may constitute conduct that was more than grossly negligent. Given alleged the facts and the reasonable inferences drawn from them, La Bruno has stated a claim for deliberate indifference against Captain Mera. Thus, Captain Mera is not entitled to qualified immunity.

        c.    *Count V: Nurse Sonia Grannum Analysis*

Using a reasonable inference from the facts La Bruno alleges against Nurse Grannum, even under the "more than gross negligence" standard articulated in *Bozeman* test, La Bruno has alleged sufficient facts to establish that Nurse Grannum was deliberately indifferent to La Bruno's serious medical need. On January 14, 2008, LaEatrice McMurray left a voicemail with Nurse Grannum notifying her of La Bruno's HIV positive status and need for antiretroviral medication, yet Nurse Grannum did not see that La Bruno got the treatment he needed until approximately six months after the date she was notified. Unlike Director Ryan, Nurse Grannum did not receive an order compelling treatment; unlike Captain Mera, she was not provided a copy of that order to serve as a reminder. However, the Court finds it reasonable to infer, based on Nurse Grannum's position as Director of Patient Care Services, that she was a medical administrator in a position to address complaints about the quality of patient care and the unmet, serious medical needs of patients. Moreover, as even a lay person can intuit the importance of a patient's receiving necessary

medication for the treatment of HIV to prevent its progression to AIDS, Nurse Grannum, as a medical administrator, would be aware of the necessity for treatment, as well as the serious risk that a several-month delay in treatment could pose to an HIV positive individual. She knew La Bruno needed antiretrovirals and was not receiving them, and, like Director Ryan and Captain Mera, her job placed her in a position to address his need and rectify his failure to receive care once she knew about it. Nurse Grannum's knowledge that La Bruno had HIV and needed antiretrovirals, coupled her responsibility as a medical administrator to ensure that La Bruno received necessary treatment for his HIV, makes her failure to ensure that he received treatment for almost the entire period of his incarceration conduct that was more than grossly negligent.

Given the alleged facts and the reasonable inferences drawn from them, La Bruno has stated a claim for deliberate indifference against Nurse Grannum. Thus, Nurse Grannum is not entitled to qualified immunity.

        d.    *Count VI: Dr. Robert Gonzalez Analysis*

Using a reasonable inference from the facts La Bruno alleges against Dr. Gonzalez, even under the "more than gross negligence" standard articulated in *Bozeman*, La Bruno has alleged sufficient facts to establish that Dr. Gonzalez was deliberately indifferent to La Bruno's serious medical need. Dr. Gonzalez had subjective knowledge of a risk of serious harm to La Bruno: on January 14, 2008, LaEatrice McMurray spoke with Dr. Gonzalez and notified him of La Bruno's HIV positive immunocompromised status and need for antiretroviral medication. Dr. Gonzalez, like Director Ryan, Captain Mera, and Nurse Grannum, disregarded the risk of harm to La Bruno. As Chief Medical Compliance Officer/Coordinator, Dr. Gonzalez's job duties included "rendering determinations of treatment and medications that inmates should receive," and, using a reasonable inference from the facts alleged, Dr. Gonzalez made determinations about what kind of medical treatment La Bruno should receive. As a medical professional, Dr. Gonzalez, like Nurse Grannum, would know the importance of getting treatment for HIV to prevent its progression to AIDS and the risk that a delay in treatment could pose. He knew that La Bruno had HIV and needed antiretroviral medication, yet he still determined that La Bruno should not be given necessary medication for almost the entire time he was incarcerated in the Miami-Dade County jail system. In light of his knowledge about La Bruno's HIV positive status, professional obligation to provide treatment, and

continual failure to do so, Dr. Gonzalez's actions may constitute conduct that was more than grossly negligent.

Given the alleged facts and the reasonable inferences drawn from them, La Bruno has stated facts that support a claim for deliberate indifference against Dr. Gonzalez. Thus, Dr. Gonzalez is not entitled to qualified immunity.

### III. CONCLUSION

For the forgoing reasons, the Defendants' Motion to Dismiss (D.E. #36) is DENIED. DONE and ORDERED in Chambers, Miami, Florida, on March 23, 2011.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
All counsel of record.